IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KENNETH M. C.,[1] | Case No. 3:17-cv-01881-JR |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social<br>Security, | |
| Defendant. | |

RUSSO, Magistrate Judge:

Kenneth M. C. ("plaintiff") brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed and this case is remanded for the immediate payment of benefits beginning December 17, 2015.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

## PROCEDURAL BACKGROUND

On August 19, 2013, plaintiff applied for DIB, alleging disability as of January 22, 2013. Tr. 168. His application was denied initially and upon reconsideration. Tr. 78-88, 90-102. On January 12, 2016, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did Martha C., plaintiff's wife, and a vocational expert ("VE"). Tr. 37-78. On May 26, 2016, the ALJ issued a decision finding plaintiff not disabled within the meaning of the Act. Tr. 15-36. After the Appeals Council denied his request for review, plaintiff filed a complaint in this Court. Tr. 1-7.

## STATEMENT OF FACTS

Born on November 10, 1950, plaintiff was 62 years old on the alleged onset date and 65 years old at the time of the hearing. Tr. 37, 181. Plaintiff died of pancreatic cancer on September 14, 2017, at the age of 66. Pl.'s Opening Br. Ex. A (doc. 12). He graduated from high school and worked previously as an automobile mechanic, van driver, and shuttle driver. Tr. 186, 271. Plaintiff alleges disability due to post-traumatic stress disorder ("PTSD"), depression, prostate cancer, high blood pressure, eye issues, and back and left foot pain. Tr. 80, 185.

## STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and internal quotations omitted). The court must weigh "both the evidence that supports and detracts from the

[Commissioner's] conclusions." Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is rational. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

The initial burden of proof rests upon the claimant to establish disability. Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." Yuckert, 482 U.S. at 140; 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled.

At step two, the Commissioner evaluates whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, he is not disabled.

At step three, the Commissioner determines whether the claimant's impairments, either singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(d). If so, the claimant is presumptively disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

At step four, the Commissioner resolves whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(f). If the claimant can work, he is not disabled; if he

cannot perform past relevant work, the burden shifts to the Commissioner. At step five, the Commissioner must establish that the claimant can perform other work existing in significant numbers in the national or local economy. Yuckert, 482 U.S. at 141-42; 20 C.F.R. § 404.1520(g). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 404.1566.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process outlined above, the ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 20, 23. At step two, the ALJ determined plaintiff's myocardial infraction was medically determinable and severe after December 17, 2015. Tr. 27. At step three, the ALJ found that plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Id.

Because plaintiff did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected his ability to work. The ALJ resolved that plaintiff had the residual functional capacity ("RFC") to perform the full range of light work. Tr. 28.

At step four, the ALJ determined plaintiff could not perform any past relevant work. Tr. 29. At step five, the ALJ concluded that there were a significant number of jobs in the national and local economy that plaintiff could perform despite his impairments, such as service writer or parts clerk. Tr. 30.

## DISCUSSION

Plaintiff argues that the ALJ erred by: (1) finding PTSD not severe at step two; (2) rejecting Martha C.'s lay testimony; and (3) finding he had transferable work skills at step five.

### I. Step Two

Plaintiff asserts the ALJ erroneously determined his PTSD was not a severe impairment. At step two, the ALJ determines whether the claimant has an impairment, or combination of impairments, that is both medically determinable and severe. 20 C.F.R. § 404.1520(c). An impairment is severe if it "significantly limit[s]" the claimant's ability to do basic work activities, which are defined as "abilities and aptitudes necessary to do most jobs." Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting 20 C.F.R. § 404.1522(b)). An impairment is medically determinable if it is diagnosed by an acceptable medical source and based upon acceptable medical evidence. 20 C.F.R. § 404.1513(a). The step two threshold is low; the Ninth Circuit describes it as a "de minimus screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).

Here, the record contains many references to plaintiff's mental impairment. On January 4, 2013, plaintiff sought a counselling referral from his general practitioner, Heidi Hagman, M.D. Tr. 497. Plaintiff reported anxiety and stress related symptoms, which caused him to consider quitting his job. Id. Dr. Hagman diagnosed plaintiff with depression and anxiety. Tr. 494. She gave plaintiff the names of three counselors. Tr. 497.

On the alleged onset date of disability, January 22, 2013, plaintiff experienced a traumatic event while driving a shuttle at work. Tr. 365-66. On January 24, 2013, Addison Wilson, M.D., diagnosed plaintiff with acute stress disorder and instructed him not to return to work until he saw a counselor. Tr. 372. Plaintiff saw a mental health doctor, E. Ray Tatyrek, Ph.D., on February 1, 2013, who also diagnosed acute stress disorder and found plaintiff was unable to return to work. Tr. 455.

On March 17, 2013, plaintiff visited the emergency room for worsening chest pain and high blood pressure, which had been present since the January 22 event. Tr. 300. Cardiovascular tests were normal, such that the provider found acute coronary syndrome very unlikely and discussed the possibility of stress causing plaintiff's symptoms. Tr. 302, 487. Plaintiff followed up with Dr. Hagman on March 18, 2013. Tr. 486. Dr. Hagman suspected the symptoms were related to plaintiff's anxiety and the traumatic event on January 22. Tr. 486.

On March 22, 2013, Dr. Tatyrek revised his diagnosis to PTSD because plaintiff's symptoms had continued for over a month and found that plaintiff was still unable to return to work. Tr. 457. On May 8, 2013, Dr. Tatyrek reported that plaintiff's symptoms were improving, but he still could not return to work because of continued nightmares, intrusive thoughts, low mood, irritability, guilt, and avoidance of the areas associated with the event. Tr. 458.

On May 20, 2013, David Heck, M.D., examined plaintiff for worker's compensation purposes. Tr. 378. During the assessment, plaintiff reported significant improvement in his psychological symptoms: he was exercising daily, sleeping better, driving again, engaging in activities both in and outside the home, and "less restless and less irritable." Tr. 383. Concerning daily activities, plaintiff reported cooking, cleaning, exercising on the treadmill, walking and playing with his dogs, refilling the bird feeders in his yard, listening to music, and watching the news. Tr. 388. He also reported recently going out of town with his wife and having a dinner-and-movie date night. Tr. 383.

Dr. Heck diagnosed plaintiff with anxiety and PTSD. Tr. 389. He noted that plaintiff suffered from anxiety prior to January 2013, which predisposed him to the development of PTSD. Tr. 392-93. Dr. Heck found that plaintiff had made "significant progress" in resolving his

PTSD and was ultimately "capable of returning to his work as a shuttle driver." Tr. 393-94. The doctor nonetheless noted "significant discrepancies/inconsistencies [that] strongly suggest [plaintiff] was not forthright during the current evaluation" and questioned plaintiff's overall desire to return to work. Tr. 391, 394.

Dr. Tatyrek continued reporting on plaintiff's mental health status and ability to return to work in relation to his worker's compensation claim through August 2013. Tr. 452-64. Beginning in August 2013, plaintiff worked part-time on his friend's berry farm in exchange for food. Tr. 20, 23, 49-50.

On July 10, 2014, Dr. Tatyrek completed a "Mental Status Report" form. Tr. 814-16, 835. Dr. Tatyrek indicated plaintiff initially suffered from a number of psychological symptoms as a result of the January 2013 incident but, as of July 2014, those symptoms had "diminished significantly." Tr. 814. In fact, the frequency of plaintiff's visits had decreased to every "1 to 3 months" and the only residual symptom Dr. Tatyrek endorsed was plaintiff's "continued avoidance of the area in which he observed the young woman's suicide." Tr. 814. As such, he noted no limitations in plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace. Tr. 815-16. Dr. Tatyrek opined further that plaintiff's PTSD was "in partial remission." Tr. 815.

On July 14, 2014, Michael Leland, Psy.D., conducted a psychodiagnostic evaluation at the request of the Social Security Administration. Tr. 659. In terms of symptoms, plaintiff reported apprehension, fear of driving and of crowds, and decreased patience for complicated things. Tr. 662. In terms of daily activities, plaintiff reported waking up, making breakfast, watching the morning news, "going out to the country and work[ing] on the property for a few

Page 7 - OPINION AND ORDER

hours," coming home and showering, "tinker[ing] around his woodshop or doing some gardening," and retiring at 11pm with six to seven hours of "solid" sleep. Id. Dr. Leland found plaintiff had "some decreased concentration" but was nonetheless within the low-average range on his mental status exam. Tr. 663-65. Based on this assessment, Dr. Leland diagnosed plaintiff with PTSD, "resolving by report." Tr. 665.

Thereafter, plaintiff did not seek any mental health treatment until October 13, 2015, when he had his annual check-up with Dr. Tatyrek. Tr. 807-36. There are no treatment notes from Dr. Tatyrek or any other mental health source following that date.

At step two, the ALJ thoroughly summarized medical evidence pertaining to plaintiff's anxiety/PTSD,[2] hypertension, ruptured back disc, prostate cancer, and eye and left foot issues. Tr. 20-27. In relevant part, the ALJ found that plaintiff's anxiety/PTSD was medically determinable but not severe. Tr. 20-27. Notably, the ALJ found that plaintiff's anxiety/PTSD had improved as of the date of Dr. Heck's May 2013 assessment, as confirmed by Dr. Leland's subsequent report. Tr. 24-25. In other words, plaintiff's anxiety/PTSD did not meet the durational requirement. Nevertheless, the ALJ continued the sequential evaluation such that "[a]ny alleged error at step two was harmless because step two was decided in [plaintiff's] favor with regard to other ailments." Mondragon v. Astrue, 364 Fed. Appx. 346, 348 (9th Cir. 2010).

Significantly, in formulating plaintiff's RFC, the ALJ considered the effects of all of plaintiff's medically determinable impairments, both severe and nonsevere, and cited to the pertinent regulations. Tr. 25-29. This analysis entailed evaluation of the relevant and probative

---

[2] Plaintiff and the Commissioner use and understand the terms "anxiety" and "PTSD" interchangeably. See generally Tr. 15-31; Pl.'s Opening Br. (doc. 12); Def.'s Resp. Br. (doc. 14); see also Corso v. Colvin, 2014 WL 950029, *5-6 (D. Or. Mar. 11, 2014) (affirming the ALJ's step two finding where the ALJ used a more general term – "history of left wrist injury" – to account for the claimant's doctors' varying descriptions of his left arm condition/symptoms).

medical evidence, including Dr. Tatyrek's reports, as well as Martha C.'s allegations. Id. The Court therefore finds the ALJ's subsequent evaluation, including the RFC assessment, adequately considered the effects of all of plaintiff's alleged symptoms. In other words, even assuming the ALJ erred in failing to find plaintiff's PTSD severe at step two, such an error was harmless. Burch, 400 F.3d at 682-83.

Finally, plaintiff neglected to meaningfully address how the ALJ's alleged error in assessing step two was harmful and any such error is not apparent to this Court. See generally Pl.'s Opening Br. (doc. 12); Pl.'s Reply Br. (doc. 16); see also McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (as amended) (party seeking reversal bears the burden of establishing how the alleged error was harmful). In any event, the record does not reflect that plaintiff's PTSD resulted in more than mild functional limitations after May 2013. Hoopai v. Astrue, 499 F.3d 1071, 1076-87 (9th Cir. 2007) (mild mental impairments need not be accounted for in the claimant's RFC). The ALJ's step two finding is affirmed.

## II. Lay Testimony

Plaintiff argues the ALJ gave improper reasons for rejecting Martha C.'s lay witness testimony. Pl.'s Opening Br. 20-24 (doc. 12). The ALJ must give reasons germane to each lay witness for rejecting their testimony. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir.1993).

Martha C. provided a third-party Adult Function Report on October 25, 2013, stating that, because of his PTSD, plaintiff had issues processing information and completing tasks. Tr. 218. As to social activities, she stated plaintiff gets flashbacks when he sees a shuttle or a young girl, and he had issues getting along with others because he frustrates and angers quickly. Tr. 222. Martha C. also stated plaintiff could only concentrate for fifteen-to-thirty minutes at a time.

Tr. 223.

The ALJ gave the third-party testimony little weight because it was contradicted by the medical evidence of record. Tr. 25-26. The ALJ also found Martha C.'s statements less credible due to her relationship with plaintiff: "as a family member perhaps concerned about her responsibilities to support [plaintiff], [Martha C.] may have an underlying financial incentive in seeing [plaintiff] obtain federal disability benefits." Id.

The alleged "underlying financial incentive" was not a germane reason to reject plaintiff's wife's function report. See Smolen, 80 F.3d at 1289 ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony.") Regardless, the ALJ's remaining rationale was legally valid. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) (contradiction with the medical record is a germane reason to reject lay statements). Here, that reason is supported by substantial evidence. As discussed above, the reports of Drs. Leland and Heck are inconsistent with Martha C.'s lay testimony. Likewise, Dr. Tatyrek's July 2014 report is not indicative of any functional limitations. The ALJ's decision is affirmed as to this issue.

### III. Step Five

Plaintiff asserts the ALJ erred at step five by finding he had transferable work skills. Pl.'s Opening Br. 11-17 (doc. 12). Where the plaintiff is "closely approaching retirement" and limited to light work, "there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry" for a finding of nondisability to be made at step five. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(f); 20 C.F.R. § 404.1568(d)(4); see also Terry v. Sullivan, 903 F.2d 1273, 1275-76 (9th Cir. 1990) ("it should surprise no one that the

[Commissioner] faces a more stringent burden when denying disability benefits to older claimants").

At step five, the ALJ purported to rely on VE testimony to find plaintiff had skills transferable to two light exertion jobs: "service writer" and "parts clerk," both falling within the light exertional category. Tr. 30. However, there is no such VE testimony in the record.

At the hearing, the ALJ asked the VE if a hypothetical individual with plaintiff's age, education, work experience, and RFC would be able to perform plaintiff's past relevant work. Tr. 75. The VE responded negatively. Id. The exchange between the ALJ and VE continued as follows:

> ALJ: No, and in terms of transferability --
> VE: No.
> ALJ: -- would there be skills that would transfer?
> VE: No transferable skills, Your Honor.
> ALJ: No transferable skills?
> VE: None.
> ALJ: Okay.

Tr. 75-76.

The ALJ subsequently sent an interrogatory to the VE, asking a series of questions based on a hypothetical individual with the same age, education, work experience, and RFC as plaintiff. Tr. 271. Relevant here, the VE answered "No" to the question of whether such an individual could "perform any skilled or semi-skilled occupations with jobs that exist in the national economy with the transferable skills identified." Tr. 273.

The ALJ's opinion misstated the VE's answer to another question, contending the VE "responded that representative occupations such an individual could perform include service writer . . . and parts clerk" Tr. 30. The only interrogatory question to which the VE gave such a

response was a question asking jobs *from which* the hypothetical individual had skills that could transfer to light exertional work. Tr. 272. The question did not ask, contrary to the ALJ's opinion, if there were any jobs *to which* plaintiff had transferable skills. Id.

There is no question of interpretation here—the VE did not state that plaintiff had acquired the transferable skills necessary for the ALJ's finding of nondisability at step five. In fact, the VE clearly and repeatedly testified that plaintiff *did not* have the requisite transferable skills. Tr. 75-76, 273. Plaintiff was "closely approaching retirement age" and limited to light work, meaning the VE's testimony that plaintiff had no transferable skills meant there were no jobs he could do with "very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." 20 § C.F.R. 404.1568(d)(4). Therefore, the ALJ erred at step five.

## IV. Remand

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1176-78 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. Treichler v. Soc. Sec. Admin., 775 F.3d 1090, 1099-1100 (9th Cir. 2014); see also Dominguez v. Colvin, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

Plaintiff contends remand for the immediate payment of benefits is warranted because the VE testified that plaintiff had no transferable skills. Pl.'s Opening Br. 16 (doc. 12). Conversely, the Commissioner contends that, although the ALJ explicitly based her conclusion on the VE's

statements, her conclusion was also supported by the definitions in the Dictionary of Occupational Titles ("DOT"). Def.'s Resp. Br. 6-8 (doc. 14). In essence, the Commissioner argues the error was harmless because remand for further proceedings would require the ALJ to "simply provide greater detail." Id.

The "greater detail" the Commissioner references constitutes an improper post-hoc rationalization. Namely, an analysis cross referencing plaintiff's RFC with the DOT definitions for the jobs the ALJ found plaintiff possessed transferable skills. It is notable the VE specifically testified plaintiff had no transferrable skills. This Court, however, is bound by the long-standing principle that judicial review of administrative decisions will be based on the ALJ's own findings and analysis. Bray v. Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009).

After independently reviewing the medical and other evidence, the Court finds the record fully developed and evinces disability as of December 17, 2015. Plaintiff was 65 years old at the time of his hearing and applied for benefits approximately five years ago. There are no outstanding issues given the VE's testimony concerning the lack of transferrable skills and, by extension, need for vocational adjustment. See Terry, 903 F.2d at 1279-80 (remanding the ALJ's decision for the immediate payment of benefits where the claimant was 64 years old, had applied for benefits four years earlier, and the VE's testimony did not constitute substantial evidence). Accordingly, the proper remedy is to remand this case for the immediate payment of benefits.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is REVERSED and this case is REMANDED for the immediate payment of benefits beginning December 17, 2015.

IT IS SO ORDERED.

DATED this 15th day of November 2018.

                                         /s/ Jolie A. Russo
                                         Jolie A. Russo
                                   United States Magistrate Judge